IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| ROBERT LEE HENRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 03-PWG-3428-M |
| | ) |
| COLE LUMPKIN, ET AL., | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OF OPINION

Robert Lee Henry, plaintiff, filed this action in the Circuit Court of Etowah County against defendants Cole Lumpkin, Cliff Heard, Police Chief Richard Crouch and the City of Gadsden alleging counts under 42 U.S.C. § 1983, civil assault, false arrest, assault and battery, and negligence. Henry seeks compensatory and punitive damages. Defendants removed this action to federal court pursuant to 28 U.S.C. § 1331 (federal question) based on the § 1983 claim.

The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

This matter is before the court on defendant's motion for summary judgment (doc. #32).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once

that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following pertinent facts are undisputed, or, if disputed, viewed in the light most favorable to Henry, the nonmoving party. On the evening of November 23, 2001 Henry began drinking beer with his neighbor at his neighbor's house around 6:00 p.m. He believes he had three or four beers that evening. Henry denies any drug use on November 23, 2001; however, he admits it is "possible" he used drugs the day before.

Henry returned to the home of Ms. Slaughter, his eighty-year old mother, around midnight on November 23, 2001. Henry found a young man visiting with his seventeen-year old daughter in Ms. Slaughter's home. Henry became angry because his mother's visitation policy was more lenient

for his daughter than it was for him.  Henry and his mother argued, and his mother called 911.  The transcript of the 911 call reflects that Henry can be overheard in the background shouting at his mother.  Henry admitted that it was his voice that said "bitch, I'm going to kill you" and "so help me God, I will kill your fucking ass."

Ms. Slaughter did not complete the call because Henry snatched the phone from her hand and hung up the phone.  When the dispatcher from 911 called the residence back, he answered the phone and told the dispatcher "didn't nobody call from here."  After Henry snatched the phone from her hand his mother ran from the house and went to a friend's house to call the police.  Henry fled to another neighbor's house to evade the police.  He wanted to avoid the police because he had been drinking and had snatched the phone away from his mother.  He testified that he feared his conduct could be construed as "maybe a strong-arm competition or something."

Around 9:30 p.m., in response to a call from Henry's mother, Officers Scott Lumpkin and Lamar Jaggears were dispatched to Meadowbrook Avenue where Henry was residing with his mother.  When he could not locate Henry, Officer Jaggears took a report from Ms. Slaughter.  She advised Officer Jaggears that Henry had threatened to burn her house down and kill her that night and that she was "scared to death."

From the neighbor's porch where he was sitting, Henry observed the officers looking for him but was not detected.  When Henry left his neighbor's home to return to his mother's residence, his daughter placed a second 911 call.  The transcript of the 911 call reflects the following conversation between Henry's daughter and the dispatcher:

DISPATCH:   911.  What is your emergency?

SPEAKER 2:   Hello.  This is (inaudible) Slaughter granddaughter.  My daddy, he's got in her face and scared her half to death when she gone to try to call the police because he keeps hanging up the phone on her.

DISPATCH:   Uh-huh (indicating yes).

SPEAKER 2:   He's just threatening her constantly, constantly.  He say he going to kill her if the police come out here tonight, so he is going to kill her because he been drinking.

DISPATCH:   Does he have a gun or any weapons?

SPEAKER 2:   I don't know what he have, but he was in there pushing on her and shoving on her and everything and she – she got scared and he keeps hanging up the phone and now he's gone up there because he – (Tape fades out).

DISPATCH:   He's running to find them or running –

SPEAKER 2:   No.  He–

DISPATCH:    – away from them?

SPEAKER 2:   He's running trying to get away from the police.

DISPATCH:   What's his name?

SPEAKER 2:   Robert Henry.  And he say he going to kill us tonight.

DISPATCH:   Robert Henry?

SPEAKER 2:   Uh-huh (indicating yes).

                              . . . .

DISPATCH:   Okay.  Robert Henry?

SPEAKER 2:   Uh-huh (indicating yes);

DISPATCH:   What's he driving?

SPEAKER 2:   He's not driving anything.  He's on foot.

DISPATCH:   What's he wearing?

4

SPEAKER 2:   He's got on a striped shirt and he's got on a hat and Nike shoes.

DISPATCH:   What color is his hat, do you know?

SPEAKER 2:   It's brown.  It's (inaudible).

DISPATCH:   And just blue jeans?

SPEAKER 2:   No.  He got on some like – They kind of like a corduroy pant, but they not. They brownish.

DISPATCH:   Brown pants?

SPEAKER 2:   And he threatening to kill her.  He going to burn up her – (Tape fades out)

(Henry Dep. at 175-176, Exhibit 23 to Henry Dep).

The dispatcher advised that Henry had "threatened to kill the female and burn her house down if officers show up," that he was running and that she could not advise on weapons.  When Officer Jaggears heard the dispatcher discussing another call from Ms. Slaughter's residence, he advised Officer Heard about the conversation he had with Ms. Slaughter earlier in the evening. Officer Heard informed Officer Jaggears that he was familiar with Henry and explained that he recalled his previous arrest of Henry.  Heard also had several discussions with Henry's mother over the years regarding Henry's drug use, her fears that he would harm her, and the fact that despite everything, she loved her son and would only call the police "if it got really bad."

Around the time Henry returned to his mother's house, Officers Lumpkin and Heard arrived on the scene.  When he heard Officers Lumpkin and Heard drive up, Henry ran out the back door of his mother's house.  His daughter told Officers Heard and Lumpkin that Henry had fled out the back door.  Officers Heard and Lumpkin separated and set out around each side of the house.

Henry hid behind a storage shed in the backyard.  There were no lights on the shed, the light on the back porch was off, and it was after midnight.  He crouched down behind the shed and placed his hands between his legs.  When he saw the officers, Henry tried to stand up, allegedly in response to a command from one of the officers, and then he was kicked in the chest and struck in the legs by the officers with their night sticks.  While he was on his back on the ground, Henry admits that he was kicking but claims that he "wasn't kicking at [the officer]."  Henry does not recall hearing either officer ask him to show his hands and does not recall either officer telling him to roll over onto his stomach.  Henry acknowledges that he was not struck after he stopped kicking and was placed on his stomach with his hands behind his back.  After the officers placed him on his stomach, they handcuffed him in accordance with "usual procedure" and transported him to the jail.

The events of November 23, 2001 were tape recorded by Officer Heard in accordance with Gadsden Police Department procedure.  The tape recording of the incident contradicts Henry's version of events.  The recording reflects that Officer Heard instructed Henry to "get down" – not, as Henry contends, to "stand up."  (Henry Dep. at 181-183, Exhibit 24 to Henry Dep.)  The recording further indicates that he was told to show his hands and to roll onto his stomach.  Henry admits that the tape recording of the incident reflects commands to "get down" and does not reflect that he was ever told to "stand up."  Henry does not challenge the authenticity of defendants' exhibits which include the transcript of the tape recording of the incident between Henry and officers Heard and Lumpkin.

Henry was charged with domestic harassment, public intoxication, and resisting arrest.  He pled guilty to domestic harassment and was given a suspended sentence of 180 days.  Pursuant to a plea agreement, the City dismissed the other charges.

6

In accordance with state law, the City conducts background checks and psychological examinations on all applicants prior to hiring them to work as police officers. Once an individual is hired, he must attend the Police Academy where he is educated on proper police procedures and trained on use of force. The City of Gadsden Police Department provides its officers with annual defensive tactics training, use of force training, and intermediate weapon training. Officers are also tested annually on proper procedures for use of force. These procedures were followed with Officers Heard and Lumpkin.

Defendants address all claims raised by Henry in their brief in support of the motion for summary judgment and argue that they are entitled to summary judgment as to all claims and as to all defendants. In response, plaintiff argues only that defendants Heard and Lumpkin are not entitled to summary judgment on the excessive force issue. Henry relies upon his deposition testimony that he was not resisting or making any aggressive movements toward Officers Heard and Lumpkin at the time they began to kick and beat him. He further relies on the fact that Gadsden Chief of Police Richard Crouch initially found that Officer Heard had violated the Department's use of force policies in effecting the plaintiff's arrest.

The court will address only the excessive claim against defendants Heard and Lumpkin as all claims not addressed by plaintiff in the brief in response to the motion for summary judgment are abandoned. See *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000)(party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41(11th Cir. 1999), *cert. denied,* 528 U.S. 1118 (2000) (a claim may be considered abandoned when it is included in the complaint, but plaintiff fails to present argument concerning this claim to the district court).

Defendants argue that they are entitled to qualified immunity.  In determining whether the defense of qualified immunity is dispositive, the initial inquiry is "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated  a constitutional right?"  See *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition....

*Id.*

I.      Was there a constitutional violation?

In determining whether there was a constitutional violation based on defendant's allegation of excessive force, the court is guided by the United State Supreme Court decision of  *Graham v. Connor*, 490 U.S. 386  (1989).

> *[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment  and its "reasonableness" standard, rather than under a "substantive due process" approach.
> ....
>
> Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. ... [The] proper application [of the reasonableness standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. ...

8

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. ....  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. ....  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intention make an objectively unreasonable use of force constitutional.

490 U.S. at 395-97.

Plaintiff argues that he testified that he was not resisting or making any aggressive movements toward the officers at the time they began to kick and beat him.  Plaintiff testified the officers found him crouching behind the shed in his mother's yard:

Q.    Did either one of the officers say anything to you?

A.    One of the officers, I don't know which one it was, said there he is right there, said get up from there.  So when he said get up, I attempted to stand straight up.  When I started standing up one of them kicked me in the chest. ... It knocked me back down.  Then they started beating on my legs with the night sticks.

....

Q.    And that statement you say wasn't made until they were both about at the corner of the building?

A.    Both was at the corner of the building shining the flashlights down on me. .... That's when one said, there he is, said get up from there.

Q.    Where were your hands?

9

A.      My hands were to the – more less like down in front of me, you know.

Q.      Between your legs?

A.      Between my legs, yes.

....

Q.      Then what did you do?

A.      I attempted to stand up as I was told to.  And in the process of trying to stand up one kicked me in the chest.... And when he kicked me in the chest, I fell back.  Both of them started beating me on both of my legs with both of the night sticks.

....

Q.      Did someone tell you – did one of the officers tell you to show them your hands?

A.      No.  Neither one asked me to show no signs of hands, period.  They just told me to get up.

Q.      Did you ever say anything to them?

A.      Not to my knowledge.

Q.      So somebody told you to get up and then one of the officers kicked you in the chest?

A.      Right.

Q.      Then what happened?

A.      I fell down on my back.  They started beating me on both legs one from each side.

Q.      Were you trying to keep them from hitting you?

A.      No.

Q.      Did you not kick your feet?

A.      No.  I didn't kick anything.  Only thing I kicked was when they beating me and I was kicking, but I wasn't kicking at them.

....

10

Q.      ... Once they rolled you over on your stomach, did they – were there any hits after that?

A.      Not to my knowledge, no.

(Henry depo., pp. 71-81).

An audiotape of the arrest based on a hand held tape-recorded carried by Officer Heard contains

Heard's repeated orders to Henry to "get down:"

(Heard)         Hey, how you doing?

(Unknown)       (can't understand) he went out.

(Heard)         Desist.  Get on.  Get down.

(Unknown)       What I did, man?

(Heard)         Get down.

(Unknown)       I haven't did nothing.

(Heard)         Get down.

(Unknown)       I'm down.  I'm down.  I'm down.

(Heard)         Get down.  See your hands.

(Unknown)       I'm down, man.

(Heard)         Let me see your hands.

(Unknown)       (can't understand)

(Heard)         Roll over on your stomach.  See your hands.  Put your hands behind your back.  Put your hands behind your back.

(Heard)         You're going to jail.  Tape end.

(Defendant's Exhibit A.3).

11

Henry listened to the audiotape and testified as follows:

> Q.    Now, nowhere on that tape does anyone tell you to stand up, do they?
>
> A.    No.
>
> Q.    As a matter of fact, they tell you to get on the ground, don't they?
>
> A.    Yeah.
>
> Q.    They tell you to get on the ground?
>
> A.    Yeah, yeah.
>
> Q.    They want you on the ground.  They don't want you standing up, do they?
>
> A.    Yeah.
>
> ....
>
> Q.    And that's exactly what happened out there , wasn't it?  They told you to get on the ground, didn't they?
>
> A.    That's not exactly what happened either.
>
> Q.    Well, that's what the tape says.
>
> A.    Yeah, that's what the tape says.
>
> ....
>
> Q.    Now, if Officer Heard or Officer Lumpkin told you to get on the ground, it wouldn't have taken very much for you to go from a squatted position to the ground, would it?
>
> A.    Absolutely.
>
> Q.    It wouldn't have taken much, would it?
>
> A.    No.

(Henry depo., pp. 181-83).

Although Henry testified that he was obeying the order to stand up, they transcript of the audiotape of the arrest clearly shows that Henry was told to "get down."  Henry specifically stated in his response to the motion for summary judgment that the authenticity of his exhibits was not disputed. Because Henry's testimony concerning the order was in direct conflict with the audiotape of the order, Henry's testimony that he was complying with the officers' order to "stand up" is due to be disregarded.  *Kesinger ex rel. estate of Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004).

In the case before this court, the officers were aware when they arrived at the home of Henry's mother that Henry had threatened to burn her house down and kill her that night, that Henry's mother was scared, and  that Henry had prevented her from completing a call to 911.

The officers were also aware that Henry had been drinking that night, had a history of drug use,  and had fled when officers responded to a second call that evening from his mother.  The officers did not know whether Henry had a gun or other weapon. When the officers arrived in response to a third call about Henry, this time from Henry's daughter, they were told that Henry had fled out the back door.  It was after midnight when the officers located Henry hiding behind a storage shed.  There were no lights on the shed and the back porch light was off.  Rather than "getting down" as instructed, Henry tried  to stand up.  Henry was then kicked in the chest once.  He fell on his back on the ground and began kicking.  The officers struck him on the legs with night sticks until he had ceased kicking and was on his stomach with his hands behind his back.  Henry complains of a single kick to the chest and the striking of his legs with the nightsticks.

The threat to burn down his mother's house and to kill her was a serious crime and indicated that Henry was an immediate threat to the safety of his mother.  The fact that Henry had made such threats, had been drinking, might have been under the influence of drugs,  might have been armed,

13

and was hiding in a dark place would also pose an immediate threat to the officers.  Henry's attempt to stand, contrary to the instructions of the officers to "get down," could reasonably have been perceived as an attempt to evade arrest by fleeing – particularly in light of his flight earlier that night. His kicking while on the ground could be reasonably have been perceived as an active resistance to arrest. The officers' actions were objectively reasonable in light of the facts and circumstances confronting them.  The force used by Officers Heard and Lumpkin did not violate the Constitution.[1/]

II.     Assuming that there was a Fourth Amendment violation, was that right clearly established?

As previously noted, this portion of the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."

In *Brosseau v. Haugen*, 125 S.Ct. 596 (2004), the United States Supreme Court held that an officer who shot a suspect who was fleeing in a vehicle was entitled to qualified immunity.  The court did not look at whether the officer's use of force was constitutional but only whether the officer was entitled to qualified immunity.  In determining the officer's entitlement to qualified immunity, the court looked at other cases involving suspects fleeing in a vehicle that had been decided at the time of the Brosseau's actions to see if it was clearly established that the officer violated the plaintiff's Fourth Amendment right.  The court noted that cases that post dated the conduct in question could not have given the officer fair notice and were "of no use in the clearly established inquiry." 125 S.Ct. at 600, n.4.  The court analyzed three cases that preceded the conduct in question and concluded:

> These three cases taken together undoubtedly show that this area is
> one in which the result depends very much on the facts of each case.

---

[1/]     The court notes that Henry's physical injuries were limited to "broken glasses, pains of the chest and both legs."
(Henry depo., 97-98).  He does not complain of the conduct which led to his broken glasses.

> None of them squarely governs the case here; they do suggest that Brosseau's action fell in the "'hazy border between excessive and acceptable force.'" *Saucier v. Katz, supra*, at 206, 121 S.Ct. 2151. The cases by no means "clearly establish" that Brosseau's conduct violated the Fourth Amendment.

125 S.Ct. at 600.

Defendants identify two cases that preceded the November 23, 2001 arrest of Henry.   In *Menuel v. City of Atlanta*, 25 F.3d 990 (11th Cir. 1994), the Eleventh Circuit held that the shooting death of a mentally unstable woman who first threatened officers with a knife and then shot at them did not violate the Fourth Amendment.  In *Menuel*, the court stated:

> The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable.

25 F.3d at 996-97, quoting *Plakas v. Drinski*, 19 F.3d 1143, 1148-50 (7th Cir. 1994).

In *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994), *cert. denied,* 513 U.S. 1152 (1995),  the Ninth Circuit upheld a jury verdict finding that police officers acted reasonably in using pain compliance techniques to arrest demonstrators who passively resisted arrest and removal from the private property on which they were demonstrating.   While the demonstrators argued that dragging and carrying was a more reasonable means of removing them, the appellate court observed:

> Police officers, however, are not required to use the least intrusive degree of force possible.  Rather, ...the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the fact from the perspective of a reasonable officer on the scene.

*Graham*, *supra,* had also been decided by the time of Henry's arrest.  The parties have not identified any cases decided prior to November 23, 2001 that are  factually similar to Henry's nor has the court found any.

15

Because there are no cases precisely on point, this case would appear to fall in that "'hazy border between excessive and acceptable force.'" *Saucier v. Katz, supra*, at 206, 121 S.Ct. 2151. As the pre-November, 2001 cases by no means "clearly establish" that the conduct of Officers Heard and Lumpkin violated the Fourth Amendment, they are entitled to qualified immunity with respect to the excessive force claim.

Henry points out that Police Chief Crouch initially found that Officer Heard had violated the Department's use of force policies in effecting the plaintiff's arrest and argues that the force applied did not comply with the Gadsden Police Department's "minimum force necessary" policy. A violation of department policy, however, is not relevant to the constitutional analysis.[2]

Based on the foregoing, defendants Motion for Summary Judgment (doc. #32) is due to granted. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 28th day of September, 2005.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

---

[2] The court notes that the police chief's initial determination was based upon his review of limited, unsworn evidence from the investigation conducted by the Gadsden Police Department. When Officer Heard appealed from his suspension to the Gadsden Civil Service Board, the board held a hearing and took sworn testimony from Henry, Officer Heard and an expert witness on the use of force. The Board exonerated Officer Heard of any violation of the City's policies and procedures.